THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **HOSEA TYLER**, | **CIVIL ACTION** |
| v. | |
| **PENSKE TRUCK LEASING CO., L.P., et al.** | No. 24-5369 |

Henry, J. *s/CH*  May 21, 2025

**<u>MEMORANDUM</u>**

    Pennsylvania law permits the use of medical marijuana with a prescription. Federal law forbids it for some drivers of commercial vehicles. Hosea Tyler was conditionally hired for a job at Penske, at which time he disclosed that he has a medical marijuana card valid in Pennsylvania. The job apparently included driving, which would have meant the driver and Penske were subject to federal regulations that forbid marijuana use. Penske delayed Tyler's start date, then rescinded the hiring altogether. It offered only that "Penske can't accommodate your medical marijuana card" and that Penske "doesn't like medical marijuana cards." Tyler countered that he was willing to forgo marijuana use and find alternate treatments, but Penske did not budge. Tyler now complains that Penske's decision was a violation of the Americans with Disabilities Act (ADA), the Medical Marijuana Act (MMA), and a wrongful termination under common law. I now consider Penske's motion to dismiss the complaint for failure to state a claim.

1

I. **BACKGROUND**[1]

Hosea Tyler applied to a job with Penske in Pittsburgh.[2] Tyler is a Pennsylvanian with an anxiety disorder and "other medical conditions" for which he was prescribed a medical marijuana card. The card was prescribed by a licensed medical practitioner under Pennsylvania law who had advised him that use of medical marijuana "outside of work hours while not on duty would not adversely affect [his] ability to safely operate any motor vehicle." The complaint is silent as to how long Tyler has had the card, whether he obtained marijuana before mid-July 2024, or whether he used marijuana before mid-July 2024.

After his application and two interviews, Tyler had been contingently offered the position of "Sales and Operations Management Trainee." According to the posting, which was attached to the motion, the position "is regulated by the Department of Transportation or designated as safety sensitive by the company, and the ability to work in a constant state of alertness and in a safe manner is required." Mot. Ex. 2, ECF 9-3 at 3. The qualifications included "the ability and willingness to drive our Penske vehicles, including a 26' box truck." *Id.* Yet Tyler contends that he was "never once informed" that he would actually need to drive any vehicle for the position, which he refers to as an "inside sales position." In his two interviews, there was no discussion of driving, and during the orientation he completed, he was told he would never have to operate any vehicles "on any public roadway." Instead, he pleads that for his position he would have worked at the front

---

[1] At this level, I accept the factual content of the complaint as true. *See infra* § II. When I refer to "the complaint," I mean the operative complaint: In this case, the second amended complaint, filed at ECF 7.

[2] The job would have been with two businesses: Penske Logistics, LLC, which provides "logistic management solutions, finance and cost control, and operational support for vehicle lifecycles"; and Penske Truck Leasing Co., L.P., which "provides transportation solutions . . . primarily through rental and leasing opportunities." I refer to them jointly as "Penske." The parties draw no distinction between them for the purposes of this motion.

2

desk, taken payments, answered calls, completed paperwork, helped match customers to vehicles, drafted contracts, and followed up with payments.

The offer letter, also attached to the motion, included among its "pre-employment conditions" the "[s]uccessful completion of drug screening as soon as possible, within 48 hours of this offer letter [and] receipt of successful drug test results." Mot. Ex 1, ECF 9-2. The letter was dated June 17, 2024 and announced the start of work on June 25, 2024. Tyler left Lancaster for Pittsburgh.

Tyler also disclosed to Ebonie Jackson, his recruiter, that he had a medical marijuana card. (It is unclear precisely when he did that, but the complaint implies it was after he received the offer letter.) Jackson told Tyler that his start date would be delayed. On July 2, 2024, Jackson asked Tyler to send her the card, which he did. Jackson told Tyler that Penske "doesn't like medical marijuana cards" and probably would not proceed with the hiring. Later in July, Tyler was told that he was not going to be hired because "Penske can't accommodate your medical marijuana card." No other reason was given.

Tyler offered to make his own accommodations so that he could get the job. He told Jackson that he was willing to refrain from any marijuana use and find alternate treatments. Penske did not change its course, and ultimately informed Tyler in late July that it was rescinding his contingent job offer.

## II. LEGAL FRAMEWORK

To survive a motion to dismiss under Rule 12(b)(6), the complaint must set forth facts that raise a plausible inference that the defendant inflicted a legally cognizable harm upon the plaintiff. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "[S]tating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest the required element. This does not impose a

3

probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quotation marks and citations omitted). The rule "does not permit dismissal of a well-pleaded complaint simply because it strikes a savvy judge that actual proof of those facts is improbable." *Id.* (quotation marks omitted).

In considering a motion to dismiss, courts generally may not consider evidence presented outside of the pleadings without converting the motion to a summary judgment motion. Fed. R. Civ. P. 12(d). I may nevertheless consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Gaur. Corp. v. White Consol. Indus. Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied." *Id*.

### III. DISCUSSION

I begin by considering the complaint's claims under the ADA, which sound in discrimination, retaliation, and failure to accommodate. Afterward, I address the state law claims.

#### A. Disability Discrimination under the ADA (Count III[1])

To state a claim of disability discrimination, a plaintiff must allege that "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). Penske does not contest that Tyler adequately pleads the first element, *i.e.*, that he suffers from "an anxiety disorder and other medical

conditions" that qualify under the ADA. *See* Compl. ¶¶ 21, 23. Instead, it denies 1) that he was otherwise qualified for the job and 2) that his non-hiring was caused by discrimination.

> i. The Regulation of Marijuana "Use" in Commercial Driving

Penske's claim as to Tyler's being unqualified would demand finding that there is no reasonable inference that Tyler was qualified. Of course, Penske did originally offer Tyler the position, and it appears to have rescinded the offer based on nothing more than the additional information about his anxiety and marijuana card, so the evidence strongly implies that one or both of those was what caused the rescission. Penske does not argue that it has the legal discretion to discriminate against marijuana card holders or users, only that they are unqualified to be its drivers by law. The question of whether Tyler was qualified therefore depends on Penske's contention that he was legally disqualified.

Assuming that the driving qualifications apply, under Federal regulations, drivers of commercial motor vehicles cannot use marijuana. Penske's business (both Penske Logistics and Penske Truck Leasing) is centered on the operation, rental, and maintenance of commercial motor vehicles. Compl. ¶¶ 5–7. The parties do not dispute that Penske is governed by Federal Department of Transportation regulations, including Part 391 of the title on transportation. 49 C.F.R. § 391.1(a) (announcing that Part 391 establishes minimum qualifications for drivers of "commercial motor vehicles" for "motor carriers," as well as minimum duties for carriers with respect to the drivers). Among the "physical" requirements in Part 391 is that the driver "[d]oes not use any drug or substance identified in Schedule I of the Controlled Substance Act (CSA). *Id*. § 391.41(b)(12). Schedule I includes marijuana, 21 C.F.R. § 1308.11(d)(23) (as "Marihuana"), and the CSA "contains no exception—express or implied—for medically-prescribed marijuana[.]" *United States v. Bey*, 341 F. Supp.3d 528, 530 (E.D. Pa. 2018). Since Penske itself and "many of its positions" are subject to them, Penske argues that these regulations "prohibited Penske from

hiring" Tyler. Defs' Memo. 6–7. Both the job posting and the offer letter refer to driving as a part of the position's duties and to the resulting DOT regulation. *Id*. Exs. 1, 2.

Tyler counters that, despite his possession of a medical marijuana card, the complaint does not reveal any *use* of marijuana at the time of his non-hiring. The complaint alleges that he had last used marijuana "approximately one (1) week prior to being informed that he was not being hired, and was not currently using at the time of his non-hire/termination." Compl. ¶ 28.[3] It also notes that Tyler had told Jackson that "he *only used* his prescription marijuana, *if needed*, in the evening at night; prior to going to bed; outside of work hours; and was never impaired as a result of his medical therapy." *Id.* ¶ 27 (footnote omitted, emphasis provided). Tyler also alleges he was not hired "for engaging in actions he was lawfully permitted to do," *id*. ¶ 47, although this leaves ambiguous whether the "actions" were getting a marijuana prescription, using it, or requesting accommodations under the ADA.

This scant information is not enough to determine that Tyler was unqualified to drive at the Rule 12(b)(6) standard at the time of the recission. As noted above, Tyler would be qualified only if he "[d]oes not use" marijuana. The very limited facts are that 1) Tyler consumed marijuana at least one time in mid- to late-July, 2) he abstained from marijuana for at least one week afterward, and 3) he told the recruiter that he only used his prescription "if needed." There is no information as to any admission by Tyler to Penske during this process of any use of marijuana, or how long it had been since he last used it.[4] Off this record, many reasonable inferences are possible. For instance, it would not be unreasonable to infer that Tyler had not used marijuana for years, *i.e.*,

---

[3] The date when Tyler was "informed that he was not being hired" is referred to in Compl. ¶ 18 as "late July of 2024."

[4] Although Penske's briefing refers several times to a "positive drug screen," that fact is absent in both the complaint and Penske's attachments, so I will disregard it.

6

that the prescription was simply something he kept available—until, after his relocation to Pittsburgh to work for this job had backfired and his hiring was evidently being rescinded, he become anxious and did use it. With that inference, he would sufficiently have "not use[d]" for the purposes of the Part 391, at least prior to that July use. *See Herman v. City of Allentown*, 985 F. Supp. 569, 578–79 (E.D. Pa. 1997) (finding after trial that ADA plaintiff alleging discriminatory non-(re)hiring was non-user after nine drug-free months, under ADA's own drug use disqualification statute rather than Part 391); *see also* Equal Employment Opportunity Commission, Technical Assistance Manual on the Employment Provisions (Title I) of the ADA § 8.3 (1992) ("'Current' drug use means that the illegal use of drugs occurred recently enough to justify an employer's reasonable belief that involvement with drugs is an on-going problem. It is not limited to the day of use, or recent weeks or days, in terms of an employment action. It is determined on a case-by-case basis."). It is certainly possible that discovery will reveal that the recission was complete by the time he used marijuana.[5]

I therefore find that the complaint narrowly permits the reasonable inference that Tyler was "not a user" of marijuana at the time his hiring was rescinded.

### ii. Whether the Driving Requirements Were Pretextual

A separate question is whether commercial driving was really part of the job for which Tyler was hired, and therefore whether these commercial driving qualifications apply at all. A

---

[5] Tyler argues that he "was "not 'using' when he was informed of his non-hire." Resp. 12. If he means at the time he received word in late July, when he had used marijuana one week prior, then he is probably incorrect as a matter of law. *See Collings v. Longview Fibre Co.*, 63 F.3d 828, 833 (9th Cir. 1995) ("As the regulations indicate . . . the term 'currently engaging' is not intended to be limited to the use of drugs on the days of, or within a matter of days or weeks before, the employment action in question. Rather, the provision is intended to apply to the illegal use of drugs that has occurred recently enough to indicate that the individual is actively engaged in such conduct."; drug involvement within the weeks and months prior to termination indicated "current use"). Although I reject that argument, I agree that it is reasonably inferable that he was "not using" prior to his implicitly admitted consumption in mid- or late-July.

person who is barred from driving commercial vehicles may still be hired to do another job—probably most jobs titled "Sales and Operations Management Trainee." *See* 49 C.F.R. § 391.1 (Part 391 applies to "persons who drive commercial motor vehicles as, for, or on behalf of motor carriers"); *id.* § 391.11 (prohibiting motor carriers from permitting someone not qualified to drive).

Penske offers a strong factual basis from the job posting and offer letter on which to infer that this position did include as part of its essential duties commercial driving. Penske is a transportation company, the "crux" of whose business "revolves around the operation, rental, and maintenance of commercial motor vehicles." Defs' Memo. 7; compl. ¶¶ 5–6 (alleging about the same). It and "many of its positions" are regulated by Part 391. Defs' Memo. 7. As that statement concedes, Penske's coverage under Part 391 does not mean that every position at Penske is regulated as well, only that it is responsible for those that are. *See* 49 C.F.R. § 391.11(a).

But the complaint offers sufficient facts to reasonably infer that the driving requirement was pretextual: Tyler claims he was "never once informed" that he would need to drive (presumably he means besides the job posting and offer letter), and that he "was informed during the orientation process that he would *never* have to operate any vehicles on any public roadway for his inside sale position." Compl. ¶ 31 (emphasis added).[6] As mentioned above, the job title itself, "Sales and Operations Management Trainee," does not suggest driving, nor does the "Position Summary" or "Major Responsibilities" given by the posting. Defs' Mot. Ex. 2. Additionally, the recruiter told Tyler both that the company "doesn't like medical marijuana cards" and that his status as a cardholder was the reason for his non-hiring. Compl. ¶ 19(1). Those

---

[6] That Tyler was told that he would not need to drive "on any public roadway" might be taken to imply that he *would* need to drive within parking lots or warehouses. Nevertheless, at this level, I do not find that inference so compelling as to make the others unreasonable.

8

statements are very different from explaining that his marijuana use simply legally disqualified him from the driving aspect of the position.

The complaint adequately and plausibly alleges that the position for which Tyler was contingently hired would not actually have required driving, and that the putative requirement was included only to permit the company to discriminate against people with disorders that are treated with marijuana. Granting that inference, the position would not have been regulated under Part 391.

### iii. Whether the Disability Caused the Termination

Penske argues that the complaint fails to adequately allege causation under the third prong, describing his allegations connecting his non-hiring to the disclosure of his purported disabilities and cardholder status as "conclusory and speculative." Defs' Memo. 10. To demonstrate the required *prima facie* case of causation for the adverse decision, a plaintiff must point to evidence sufficient to create an inference that the disability was a but-for cause of the termination. *Furgess v. Pa. Dep't of Corrections*, 933 F. 3d 285, 291 & n.25 (3d Cir. 2019).

It is not necessary at this level for Tyler to prove that his non-hiring was caused by his anxiety disorder, only to show that it would be a reasonable inference. *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995). (*prima facie* case sufficient at summary judgment "merely raises an inference of discrimination" (quotation marks omitted)). Here, Penske offered him the job, then became aware that he was prescribed medication for an anxiety disorder, and then rescinded the offer. No other intervening actions are apparent. Penske's possible aversion to hiring employees who use drugs prohibited by federal law is one reasonable inference for the cause, but so too is Penske's possible aversion to hiring employees who have anxiety disorders. The complaint is adequate on this point.

### B. Failure to Accommodate under the ADA (Count III[3])

To state a claim for failure to accommodate under the ADA, a plaintiff must allege that "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312–13 (3d Cir. 1999). Penske argues only that Tyler "cannot show that the suggested accommodation . . . is a reasonable accommodation, as [it] would violate federal law." Defs. Memo. 12. Although Penske's motion implicates the third and fourth prongs, things get stuck on the second, since the nature of the request is itself unclear.

For Tyler to make a request to under the ADA, he needed to ask Penske for something that would reasonably accommodate his "known physical or mental limitations." 42 U.S.C. § 12112(b)(5)(A); A "reasonable accommodation" is a modification or adjustment to the job application, work environment, or that otherwise permits an employee to enjoy a job's "benefits and privileges". 29 C.F.R. § 1630.2(*o*)(1); *see id.* § 1630.2(*o*)(2) (offering examples).[7]

The complaint describes Tyler's only request for accommodation as being permission to work while *foregoing* the use of medical marijuana. Compl. ¶ 25 (citing a request "for Plaintiff to work while taking alternative medications to manage his health and foregoing medical marijuana" as the "accommodation").[8] In substance, Tyler was asking for Penske to reconsider its impending

---

[7] A reasonable accommodation may include "job restructuring." 29 C.F.R. § 1630.2(*o*)(2). To the extent that driving *was* an essential duty of the position on offer, Tyler does not argue that Penske was required to modify its unfilled position as an accommodation. Instead, he focuses on his promises to forego marijuana prospectively. He also provides no authority for the proposition that Penske would have to credit that representation.

[8] Tyler's allegation elsewhere that he "kept Defendants[] . . . informed of his serious medical conditions and need for accommodations," compl. ¶ 52, is too conclusory to "show[]" this

hiring recission by offering to forego marijuana use. He clearly hoped that the marijuana use was Penske's only concern about him, based on his contingent offer and what the recruiter had told him. Rather than a request to accommodate Tyler's limitations under the ADA, this was Tyler's offer to accommodate *Penske*. The fact that Penske did not relent after his offer might later be taken as evidence that it was not actually concerned about marijuana use but the underlying anxiety disorder. Or, it could be evidence that Penske was concerned about the legal ramifications of hiring him regardless of his future use. At this level, I would only evaluate whether the complaint adequately pleads that a request was made.

Penske's motion is unclear at best about whether it agrees that that was the request. It does refer to the "suggested accommodation in the [complaint]" as Tyler's working "while taking alternative medications," which it dispatches summarily as illegal under the driver qualification regulation. Defs' Memo. 12. Then, it argues that it was not required to accommodate Tyler's "use of medical marijuana," citing a case in which a petitioner had requested that as the specific accommodation. *Id.*; *see Harrisburg Area Cmty. Coll. v. Pennsylvania Hum. Rels. Comm'n*, 245 A.3d 283, 285 (Pa. Commw. Ct. 2020) (request for the accommodation of "being permitted to take her legally prescribed medical marijuana medication" found barred by statute). Finally, it refers to either "exploring whether Plaintiff could take alternative medications" or "ignor[ing] Plaintiff's positive drug test" as requested accommodations. Defs' Memo. 13. At this level, Penske could have argued that Tyler's complaint was ambiguous, but instead it incorporated the ambiguity.

The law around reasonable accommodations does not require a *request*, as such, despite the standard recited above from *Taylor*. By regulation, "[t]o determine the appropriate reasonable

---

element under Rule 8(a)(2). If he requested an accommodation by Penske, for instance that he be permitted to use medical marijuana or that he any driving duties be stripped from his position, that is not pleaded.

11

accommodation it may be necessary *for the [employer] to initiate* an informal, interactive process with the [employee] in need of accommodation." 29 C.F.R. § 1630.2(*o*)(3) (emphasis provided). Regardless, at minimum, "the employer must know of both the disability and the employee's desire for accommodations for that disability." *Taylor*, 184 F.3d at 313; *see Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 165 & n.8 (5th Cir. 1996) ("employee's initial request for an accommodation . . . triggers the employer's obligation to participate in the interactive process"). Once the employer is on notice, it has a duty to begin an interactive process to "identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3).

      Tyler claims that Penske failed to initiate this interactive process. Perhaps having raised his anxiety disorder and the fact that it was treated or treatable with marijuana, Penske should have been on notice that he would have wanted an accommodation. But even if Penske presumed that such a disorder might demand accommodations in some circumstances, Tyler specifically disclaimed any accommodations from Penske. Despite using the word "accommodation" to refer to Penske's hiring him on the promise that he not use marijuana, Tyler was insisting that his anxiety would require *no* accommodation, because it would not interfere with his work at all.[9] Nor does Tyler offer any argument or authority to show that disclosure of his anxiety disorder or having a marijuana card was sufficient to trigger Penske's responsibility to begin an interactive process.

---

[9] Another theory on accommodation might be read from the complaint as to changing the position duties. Although Tyler did not request that he be permitted to take the job without its driving duties, that was likely because he had been led to believe that no such driving duties existed. It is easy to infer from the complaint that such an accommodation would have been reasonable, since that was the representation made to him during some employee orientation. *See supra* § III.A.ii. The question instead would be whether removing the driving element would have been an accommodation *for his disability* under the ADA or rather for his marijuana use. Tyler does not include this reading in his complaint or his briefing, so I do not explore it.

Inasmuch as the parties generally agree that the request was "to work while taking alternative medications to manage his health and foregoing medical marijuana," Penske's only argument on reasonableness is that it was legally barred from hiring a drug user under its argument elsewhere. Tyler's argument is not exactly responsive to Penske's motion, because it does not address the reasonableness or legality of the request.

I have no factual basis on which to determine whether it was reasonable, but also no argument to go on. Penske has not attached any documentation that would indicate that his taking the alternative medications themselves was a burden, for instance if the alternative medication required him to visit a clinic during the workday. And although the burden is on the plaintiff to include sufficient factual content in the complaint, the movant must show its entitlement to dismissal. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021). Since the only grounds on which Penske moves to dismiss are the legal unreasonableness of any accommodation, which it cannot show at this point, I deny its motion as to Count III[3].

### C. Retaliation under the ADA (Count III[2])

To state a claim of retaliation under the ADA, the plaintiff must plead "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004). The plaintiff may establish causation through "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link," *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007), or "that from the evidence gleaned from the entire

record as a whole the trier of fact should infer causation." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281 (3d Cir.2000).

Penske argues only that causation is lacking, either because it was prohibited from hiring Tyler under the regulations or because the complaint insufficiently alleges pretext.[10] These objections fail for the same reasons as in the prior discussion: If the driving requirement was pretextual, which may be reasonably inferred, then Penske was *not* legally prohibited from hiring Tyler. Further, *ipso facto*, there would have been pretext sufficient to infer causation at this level.

### D.  MMA (Count I) and Wrongful Termination (Count II)

Finally, Tyler makes claims under the Pennsylvania Medical Marijuana Act and common law wrongful termination. Penske moves to dismiss both counts because they are preempted by federal law and because each fails on its own merits.

#### i.  Preemption

Penske argues that the state law claims are preempted because federal law governs, and prohibits, the hiring of commercial drivers who are marijuana users. "The crux of Penske's business operations revolves around the operation, rental, and maintenance of commercial motor vehicles," which is why "Penske and many of its positions are subject to DOT regulations." Defs' Memo. 7. The regulatory structure to which it refers, Part 391, is the same as discussed above. Tyler concedes that federal law preempts state law. Nevertheless, as with the ADA counts, the complaint adequately raises circumstances in which the federal law in question would not have applied. On the inference that the driving requirement was pretextual, the preempting regulation is avoided. Similarly, on the inference that driving was a bona fide requirement of the position but

---

[10] Penske identifies as the protected activity Tyler's "purported requested accommodation to take alternative medications." Defs' Memo. 12.

Tyler did not use marijuana, the preempting regulation was avoided—at least, until he used marijuana in mid- or late-July.

> ii. MMA (Count I)

Under Pennsylvania's Medical Marijuana Act, "[n]o employer may . . . refuse to hire" an employee "solely on the basis of such employee's status as an individual who is certified to use marijuana," *i.e.*, a marijuana card holder. 35 P.S. § 10231.2103(b)(1). To state a claim under the MMA, Tyler would need to show "(1) he was discriminated against on the basis of his status as cardholder, and (2) that but for his status," he would have been hired. *See Reynolds v. Willet Mfg. Co., LLC*, 567 F. Supp.3d 553, 559 (E.D. Pa. 2021). Penske argues that Tyler failed to adequately plead that his hiring recission was due *only* to his status as a marijuana cardholder. To do so, it relies on the assertion that Tyler had failed a drug test, which is not supported at this level.

Tyler's claim under the MMA relies on his being discriminated against solely because of his having been a marijuana cardholder. Tyler pleads that the recruiter specifically told him as much. Compl. ¶ 18. It is reasonable to infer that the recruiter spoke honestly for her company.

> iii. Wrongful Termination (Count II)

Penske argues that Tyler failed to adequately plead his wrongful termination claim. Any wrongful termination claim is set against the clear and "extremely strong" presumption that non-contractual work in Pennsylvania is at-will, and that a business may therefore fire its employee without cause. *McLaughlin v. Gastrointestinal Specialists, Inc.*, 561 Pa. 307, 314 (Pa. 2000). Although an employee may bring suit for wrongful termination that goes against public policy, these suits are permitted "only in the most limited of circumstances where the termination implicated a clear mandate of public policy in this Commonwealth." *Id.*

First, it admits that a Pennsylvania court has permitted wrongful termination to proceed in the context of an MMA claim. See *Palmiter v. Commonwealth Health Systems, Inc.*, 260 A.3d 967,

15

977 (Pa. Super. Ct. 2021). Then, it argues that the MMA nevertheless "allows an employer to prohibit an employee from performing life-threatening duties, or duties that pose a risk to public health and safety, while under the influence of marijuana, reflecting public policy to protect employees in the workplace as well as the general public." Defs' Memo. 16. Once again, it bases its argument on an asserted failed drug test that is not within the complaint or attachments, as well as asserted defenses that do not address whether the complaint raises reasonable inferences otherwise.

## IV. <u>CONCLUSION</u>

At the level of a motion to dismiss under Rule 12(b)(6), I must be careful to accept the factual content of the complaint and disregard evidence that is not properly before me. Given the present standard, and having considered the Defendants' attachments, I deny the motion to dismiss as to all counts.